# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | BK No. 99-02261-PJW |
| | (Jointly Administered) |
| Hechinger Investment Company of | |
| Delaware, Inc., et al. | Chapter 11 |
| Debtor | |
| | Adv. No. 01-3170 |
| Hechinger Investment Company | |
| Of Delaware, Inc., et al., Debtors | |
| In Possession, | |
| | Civil Action Nos. 05-497 and 05-498 (KAJ) |
| Plaintiff(s), | |
| vs. | |
| Universal Forest Products, Inc. | |
| Defendant. | |

## UNIVERSAL FOREST PRODUCT'S REPLY TO HECHINGER'S RESPONSE AND RESPONSE TO HECHINGER'S APPEAL REGARDING PRE-JUDGMENT INTEREST

DATED: DECEMBER 8, 2005

MONZACK AND MONACO, P.A.
Kevin M. Mangan (#3810)
1201 N. Orange Street, Suite 400
P.O. Box 2031
Wilmington, DE 19899
(302) 656-8162
kmangan@monlaw.com

and

VARNUM RIDDERING SCHMIDT & HOWLETT LLP
Michael S. McElwee (P36088)
333 Bridge Street, N.W., Suite 1700
Grand Rapids, MI 49504
(616) 336-6000
Attorneys for Defendants

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     THE CONTEMPORANEOUS EXCHANGE DEFENSE .................................. 1

      (a)    The Trial Court Correctly Rejected Hechinger's "Trick" Argument as
            Inherently Incredible. ............................................................................ 1

      (b)    Hechinger Cannot Wriggle Out of the Intent Manifest in its Own
            Remittance Advices, a Point that Even Hechinger, After Years of
            Fighting, Conceded in its Response Brief............................................... 5

      (c)    Short-term Credit transaction are Precisely the Kind of Transactions the
            "Contemporaneous Exchange" Defense Was Designed to Protect......................... 7

III.    THE ORDINARY COURSE OF BUSINESS DEFENSE ............................... 10

      (a)    Faster Payments for New Shipments are not only Preference Immune, But
            Necessary to Keep Distressed Businesses in Operation. ...................................... 11

      (b)    Contrary to Hechinger's Argument, Lower Credit Limits and Shorter
            Terms Did Not Occur for the First Time Between the Parties in 1999. .............. 13

IV.     SPOLIATION .............................................................................................. 14

V.      PRE-JUDGMENT INTEREST ...................................................................... 14

VI.     CONCLUSION............................................................................................. 16

## TABLE OF AUTHORITIES

### Cases

*Endo Steel, Inc. v. Janas (JWJ Contracting, Inc.,* 371 F.3d 1079 (9th Cir. 2004) ........................ 9

*In re Armstrong*, 260 Bankr. 454 (E.D. Ark. 2001), aff'd 291 F.3d 517 (8th Cir. 2002) ............ 15

*In re Contempri Homes, Inc.,* 269 Bankr. 124 (M. D. Pa. 2001)) ............................................. 5, 6

*In re Family Home Sales Center, Inc.,* 65 Bankr. 176 (Bankr. N. D. Ga. 1986) ........................ 8, 9

*In re First Jersey Securities, Inc.,* 180 F.3d 504 (3rd Cir. 1999)) ................................................. 11

*In re Milwaukee Cheese Wisconsin, Inc.*, 112 F.3d 845 (7th Cir. 1997) ...................................... 14

*In re Molded Acoustical Products, Inc.,* 18 F.3d 217, 224 (3rd Cir. 1994) ................................. 11

*In re Standard Food Services, Inc.,* 723 F.2d 820 (11th Cir. 1984) ............................................. 9

*In re Talono Pizza Products, Corp.,* 3 F.3d 1029, 1032 (7th Cir. 1993) ...................................... 14

*In re USN Communications, Inc.*, 280 Bankr. 573 (Bankr. Del. 2002) .................................. 15, 16

*Kallen v. Litas,* 47 Bankr. 977 (N.D. Ill. 1985) ......................................................................... 8, 9

*Sacred Heart Hospital of Norristown v. E. B. O'Reilly Serv'g Corp. (In re Sacred Heart Hospital of Norristown)*, 200 Bankr. 114 (Bankr. Pa. 1996) ...................................................... 15

*Silverman Consulting, Inc., v. Canfor Wood Products (In re Payless Cashways, Inc.),* 306 Bankr. 243 (BAP 8th Cir. 2004), *aff'd,* 394 F.3d 1082 (8th Cir. 2005) ......................................... 8

### Statutes

§ 547(c)(2) .................................................................................................................................... 15

§ 547(c)(4) .................................................................................................................................... 15

§547(c)(1) ...................................................................................................................................... 9

§547(c)(4) ...................................................................................................................................... 15

11 U.S.C. §547(c)(1).................................................................................................................... 6

### Other Authorities

5 *Collier on Bankruptcy*, 547-9 ................................................................................................. 11

I.    **INTRODUCTION**

Hechinger failed in its response Brief to show any weakness in UFP's arguments, and failed in many instances even to address the issues that are at the core of this appeal. For the reasons indicated below, the judgment of the trial court should be reversed and the case should be remanded with instructions to enter judgment for UFP.

II.    **THE CONTEMPORANEOUS EXCHANGE DEFENSE**

Hechinger's argument regarding the "contemporaneous exchange" defense consists of two basic points. The first is that Hechinger was "tricked" by UFP into making substantially contemporaneous payments, and therefore did not have the requisite intent. For its second point, Hechinger admitted that it had the requisite intent, but argued that a portion of the preference period transfers were "credit transactions," to which, according to Hechinger, the "contemporaneous exchange" defense does not apply. Neither of these arguments has merit.

(a)    **The Trial Court Correctly Rejected Hechinger's "Trick" Argument as Inherently Incredible.**

The trial court gave "no credit" to Hechinger's "trick" argument or to its attacks on UFP's honesty and integrity. See, Opinion at 16 ("This court does not credit Hechinger's contention that UFP's actions were in furtherance of a 'nefarious plot,' or that its actions were knowingly concealed from Hechinger for some devious or sinister purpose"). These attacks therefore formed no part of the rationale for the trial court's holding and thus have no relevance to this appeal. Hechinger nevertheless chose to repeat these charges anyway. This accomplished little more than forcing UFP to explain why the trial court so easily rejected them.

First, the evidence simply does not add up to Hechinger's description of it. As Hechinger indicated at page 6 of its Brief, Ms. Nickel testified at trial that UFP's goal for imposing a credit

1

limit on Hechinger's account was to keep UFP's exposure at or as close to zero as possible.[1] When a buyer falls into deep financial trouble, such a goal on the part of a seller is neither unreasonable nor unpredictable. Hechinger argued, however, that this intent was inconsistent with UFP's promise to Hechinger of a $500,000 (or $1,000,000) credit limit, and thus showed that UFP was acting in a secretly dishonest way. This suggestion is nonsense.

When a credit limit is applied both to shipped goods and to unshipped orders (a standard commercial practice),[2] a seller will generally have little or no credit exposure to a high-volume buyer, because the buyer's payments will be more-or-less evenly split between unshipped orders (payments in advance) and recent shipments (short-term credit payments). See, TT at 163 (where Ms. Nickel explained that there is no inconsistency between a credit limit of $1,000,000 and an account receivable balance of zero because "the credit limit refers to both invoiced product and orders").[3] This phenomena is well understood in the commercial world, especially to anyone with an understanding of purchase accounting, and was surely understood by Hechinger, a multi-billion dollar retail sales company. TT 57. Hechinger's accounting personnel, moreover, were not deceived even in the slightest way, as they tracked Hechinger's shifting credit/debit position with UFP on a daily (even hourly) basis throughout the preference period, and therefore knew that UFP's account receivable balance with Hechinger was often not only less than the credit limit, but less than zero.[4]

---

[1] Hechinger cited many examples of testimony to this effect, which are sprinkled throughout its response Brief. As most of the quotes Hechinger chose are variations on the same theme, UFP will limit its reply to the quote from Ms. Nickel.

[2] See, UFP's Brief at page 5. See, also TT 47.

[3] See, also, TT 55-56 (where Mr. Shumaker testified that it is commonly understood that a low credit limit on a high volume buyer tends to speed the buyer's payments and thus to eliminate the seller's risk of non-payment).

[4] See, D57; UFP Brief at page 12 through 14.

In fact, UFP could not have deceived Hechinger, even if it had wanted to. Every time Hechinger made a payment to UFP during the preference period, it knew (1) the amount of the payment, and (2) the amount of the unpaid UFP invoices in its own system. It therefore knew when it was making overpayments, and exactly what the amount of those overpayments were. Mr. Smith conceded as much in his sworn testimony:

> And I would go down to Jennifer [the wire transfer clerk] and I'd say Jennifer, Universal needs 500,000, and she'd come back to me and say we only owe them $115,000 based on what we have in our system. I'd say well, that's what they're saying, and she'd talk to Brian from Universal Forest Products, and he'd give her the information as far as what was, you know, in route so to speak.

P7 at page 64. Every time an overpayment occurred (which happened with nearly every payment – D60), UFP's credit exposure to Hechinger was, again, not only zero, but less than zero. Hechinger knew this perfectly well. It was not, and could not have been, deceived.[5]

The "silent slow downs" about which Hechinger complained in its Brief also were not deceitful, either in intention or in execution. When a low credit limit is placed on a high-volume buyer, the seller must monitor the account constantly to assure that "scheduled shipments" will not, when they leave the dock, put the buyer over the credit limit. TT 45. When large new orders hit the system, the seller will often place an over-night hold on the shipments, pending receipt of the buyer's payment the next morning. Otherwise, the credit limit will be exceeded and the seller will be exposed to an un-bargained-for risk. This is a normal and routine business practice. Even Hechinger's own Clifford Smith testified that these routine over-night holds were "no big deal" and "to me doesn't really constitute stop shipping." P 7 at Page 54. He also said,

---

[5] Hechinger's argument that it was open to deception because its accounting department was confused and disorganized is . . . well . . . an odd argument for a multi-billion dollar company. If a company is so disorganized that it can be deceived by normal vendor business practices, the blame would seem to lie with the company, not with the vendor. Still, there is nothing to indicate that Hechinger's accounting personnel were deceived in the manner Hechinger now claims, as they kept constant tabs on the level of Hechinger's overpayments to UFP. See, e.g., D 57.

"So I wouldn't – I mean, it's less than a 24-hour stop. They didn't really stop shipping, in my opinion." *Id.*

The fact that the holds were "silent" is also normal and routine. UFP instructed its operations people not to discuss the holds with third-parties or with lower-level employees at Hechinger, not to deceive Hechinger's management (which was not possible anyway), but to reduce the risk that the information would get passed to third parties and other vendors, which could be harmful to Hechinger. TT 67. Again, even Mr. Smith testified that this was a normal and expected courtesy. P7 at page 73-74 (where Mr. Smith testified that keeping new credit arrangements secret was "pretty much normal course of business with the vendor community").

Hechinger also quoted three times in its Brief (pages 6, 33 and 36) an internal email from Ms. Nickel stating that UFP had "tightened" Hechinger's credit, that Hechinger "still believed" it had a $1,000,000 limit, and that Hechinger was "wire transferring to us based on orders in the system, but orders are starting to ship slower, so we have been able to stay ahead of the game." P45. The intended implication was that UFP secretly and deceptively slowed shipments to cover itself at Hechinger's expense. Not once, however, did Hechinger cite Ms. Nickel's testimony about the meaning of this document. She testified not only that Hechinger "thought" it had a $1,000,000 credit limit, but that indeed it did have. TT at 163.[6] When asked if her comment could be read to mean that the credit limit had secretly been withdrawn, she said "[only] if you take that completely out of context." TT 200. She also said that orders were starting to ship slower at the time this email was drafted (late May of 1999, shortly before Hechinger filed for bankruptcy protection), not because UFP was holding them, but because **Hechinger was refusing shipments**. TT at 163-64 ("[Mr. Smith] was looking at the inventory balances of his

---

[6] The "tightening" she mentioned in her email was the reduction of Hechinger's credit limit back in February of 1999, from "unlimited" to $500,000 (or $1,000,000). TT 197.

stores and didn't want to get stuck with a bunch of inventory . . ."). **The shipments were slowed not by UFP, but by Hechinger**. This chewed up Hechinger's credit limit because so many unshipped orders were backed up in the system. This did indeed enable UFP to stay "ahead of the game," but its ability to do was a function of decisions made by Hechinger, not as a result of any dishonesty or deception on UFP's part.

For these and other reasons, the trial court correctly rejected Hechinger's attacks on UFP's integrity and its entire "nefarious plot" theory. There was certainly an ample basis in the factual record for the trial court's decision to do so. Hechinger's suggestion that it lacked intent because it was "tricked" is therefore entitled to no weight.

> **(b)    Hechinger Cannot Wriggle Out of the Intent Manifest in its Own Remittance Advices, a Point that Even Hechinger, After Years of Fighting, Conceded in its Response Brief.**

It is well settled that a buyer's remittance advices establish its intent (indeed, the intent of both parties) as a matter of law. UFP Brief at 10 through 12 (citing, among other cases, *In re Contempri Homes, Inc.,* 269 Bankr. 124 (M. D. Pa. 2001)). This rule is based on the common-sense notion that a buyer who applies particular payments to particular shipments, and sends notice of that application to its seller, cannot later claim that he or the seller intended the payments to be applied in a different way.

In its response Brief, Hechinger tried to distinguish *Contempri Homes* by arguing that the defendant lost in that case, so UFP (also a defendant) should lose in this case. Hechinger Brief at 15. The issue, however, is not which party lost, but which argument lost. In *Contempri Homes,* the defendant tried to contradict the remittance advices by arguing that the parties "really" intended a kind of modified COD arrangement. 269 Bankr. at 127-29. The defendant lost because the remittance advices showed that the payments were applied to older shipments, not current ones. Hechinger, too, is trying to contradict the remittance advices, by arguing that

payments made contemporaneously were "really" intended to be made later. This is exactly the type of argument the court in *Contempri Homes* rejected. The trial court's holding that Hechinger did not intend its payments as remitted was thus plainly wrong.

This issue, however, is not longer disputed, as Hechinger conceded in its response Brief that it intended the preference period transfers as remitted:

> **Plaintiff is not arguing, nor does it need to, that Hechinger intended an application of payments different from what is reflected in the remittances.**

Hechinger Brief at 16 (emphasis added). This concession establishes as a settled fact that Hechinger intended to pay $8,956,181.02 to UFP in advance (notwithstanding the trial court's holding to the contrary), and intended to pay another $7,077,108.26 to UFP within 1 to 8 days of shipment. See, UFP Brief at 9. That is, Hechinger intended the payment curve shown on D61, which depicts the timing of Hechinger's payments during the preference period. See, TT 82.

With Hechinger's intent thus established, the only issue is whether the transfers during the preference period were "substantially contemporaneous." In its response Brief, Hechinger made no effort to deny or dispute this issue. Hechinger instead argued that it is "of no moment:"

> UFP also urges the Code requires "substantially contemporaneous" payments, not "absolutely contemporaneous" ones. However, as the [trial] Court noted, not only is intent a necessary element, it is the most important element under 11 U.S.C. §547(c)(1). As the [trial] Court found that no intent to engage in contemporaneous transactions existed, whether the payments were substantially contemporaneous is of no moment.

Hechinger Brief at 20. UFP respectfully suggests that this passage is illogical, but further, that it reveals the hopelessness of Hechinger's position.

Hechinger cannot reasonably argue that the trial court's finding that Hechinger lacked the requisite intent rendered other elements of the (c)(1) defense immaterial, because Hechinger has now conceded that very intent. That is, Hechinger cannot at once admit that it had the requisite

intent and, at the same time, rely on an opinion predicated on the false conclusion that such intent was lacking. Even without Hechinger's concession, however, the trial court's ruling on the intent issue cannot be cited as a reason for ruling against UFP, because it is that same ruling that is being challenged on appeal. Once "intent" is established (either independently or through a party's concession), one simply cannot avoid the conclusion that "substantially contemporaneity" becomes the central issue in a (c)(1) case.

Hechinger nevertheless argued that the contemporaneous exchange defense does not apply to any payments on short-term antecedent debt (i.e., to "credit transactions"), even if the transactions were intended to be, and in fact were, "substantially contemporaneous." Hechinger Brief at 20. According to this argument, if credit transactions are involved, **both** "intent" **and** "substantial contemporaneity" are irrelevant. In other words, the (c)(1) defense does not apply to short-term credit transactions even if each and every element of the defense is satisfied. This argument is utterly illogical, in UFP's view, but it highlights what is truly **the** issue in this appeal. The issue this Court must decide is whether short-term credit transactions are or are not eligible for protection under the (c)(1) defense. If the Court decides that they are, Hechinger's entire position on appeal collapses. Since this issue is purely a question of law, it must be decided by the Court under the *de novo* standard.[7]

### (c)    Short-term Credit transaction are Precisely the Kind of Transactions the "Contemporaneous Exchange" Defense Was Designed to Protect.

In its initial Brief, UFP cited and analyzed several reported decisions standing for the proposition that short-term credit sales are precisely the kinds of transactions for which the (c)(1) defense was designed. See, UFP Brief at 14 through 18 (collected authorities). These opinions are noteworthy because they are so recent and because there are so many of them. They include

---

[7] With Hechinger's concession on the intent issue, any vestige of a fact question related to the (c)(1) defense was eliminated, and the "clearly erroneous" standard became inapplicable.

*Silverman Consulting, Inc., v. Canfor Wood Products (In re Payless Cashways, Co.)*, 306 Bankr. 243 (BAP 8th Cir. 2004), *aff'd*, 394 F.3d 1082 (8th Cir. 2004), a case with facts virtually identical to those in the present case. The court in *Silverman* rejected exactly the argument made here by Hechinger (i.e., that "credit transactions" are ineligible for (c)(1) treatment), holding instead that, **"A transaction can be substantially contemporaneous even if some temporal separation exists between the new value provided and the payment received. Section 547(c)(1) applies whether the new value is given before or after the transfer by the debtor; the statute requires only that the transfer be 'substantially' contemporaneous."** 306 Bankr. at 252. The opinions in *Silverman* and the other cases UFP cited are well reasoned, take into consideration the language and purpose of the statute, and by all indications have become widely accepted. They also are critically important here, as they touch upon the pivotal issue in this case.

Yet, Hechinger's only comment on these cases was . . . nothing. Hechinger said **nothing** about them **at all**. It made no attempt to distinguish them, to criticize them, or to explain why the Court should not follow them. It is fair to assume that Hechinger chose to say nothing (and thus passed the option to comment in the only filing where it had the option to do so) because it could think of nothing to say.

Hechinger did, however, cite two cases from the mid-1980s which, it alleged, stand for the proposition that the (c)(1) defense does not apply to credit transactions. Those cases are *In re Family Home Sales Center, Inc.*, 65 Bankr. 176 (Bankr. N. D. Ga. 1986) and *Kallen v. Litas*, 47 Bankr. 977 (N.D. Ill. 1985).[8] Hechinger's reliance on these cases, however, is misplaced.

The earlier case, *Kallen*, involved the payment of a contingency fee to the debtor's pre-bankruptcy attorneys. The fee was paid in January of 1982 for services dating from October of

---

[8] *Kallen* was overruled in part on appeal. See, *In re Energy Coop*, 103 Bankr. 171 (N.D. Ill. 1986).

1981 (a three month delay). Given the length of the delay, and the fact that the written contingency fee agreement provided for payment at the conclusion of the lawyer's work, the court concluded that "substantial contemporaneity" was absent. The court observed, however, that §547(c)(1) protects "transfers made to a creditor **shortly after** the creditor has extended new value to the debtor." 47 Bankr. at 983. While the court was not willing to stretch the defense to 90-day-old payments, the court held that short-term credit payments are another matter, and clearly fall within the defense. Nothing about this case is inconsistent with the UFP's position, or with the cases UFP cited.

In the *Family Home Sales* case, the vendor received a $3,783 payment from the debtor on July 5 that was due on May 11 (a 54 day delay). The vendor later provided additional services to the debtor, for which it was paid $2,819. The check for the $2,819 bounced, however, so the Trustee sued to recover only the difference - $964. The court held that the (c)(1) defense did not apply because the payment was made "well after the date of shipment involved." 65 Bankr. at 177. That is, the court was unwilling to stretch the defense to 54-day-old payments. While the court cited *Kallen* for the proposition that the (c)(1) defense applies to "cash or quasi-cash" transactions, nothing in the case suggests a rejection of the holding in *Kallen* that the defense applies to short-term credit transactions. Moreover, the transfers in the present case were all wire transfers, which are the fastest possible cash transactions, and thus clearly fall with the "cash or quasi-cash" language in the *Family Home Sales* case.[9]

---

[9] The cases containing "cash or quasi-cash" language, or "credit transaction" language, typically involve dishonored or "bounced" checks. See, e.g., *Endo Steel, Inc. v. Janas (In re JWJ Contracting, Co.)*, 371 F.3d 1079 (9th Cir. 2004); *In re Standard Food Services, Inc.*, 723 F.2d 820 (11th Cir. 1984). The holdings in these cases are predicated on language in the Congressional record indicating that the gap created when a check bounces, and is later replaced by different check or some other form of payment, severs contemporaneity and therefore undermines the (c)(1) defense. These "bounced check" cases have no application here, because Hechinger paid UFP in cash, via wire transfers.

9

Hechinger also did not address what may be the most fundamental analytical defect in its position, which is the one raised by UFP at pages 18-19 of its Brief. That is, if the (c)(1) defense does not apply to short-term credit payments, it does not apply to anything. There is no preference in the first instance if there is no payment on antecedent debt (i.e., if there is no credit payment). If Hechinger's interpretation of the statute were accepted, the (c)(1) defense would therefore become a complete statutory nullity. This illogical result is avoided by the many reported cases holding that short-term credit transactions fall within the (c)(1) defense.

For these reasons, UFP urges the Court to reverse the trial court's holding that the (c)(1) defense never applies to credit transactions, and remand this case with instructions to the trial court to enter judgment on the (c)(1) defense for UFP.

## III.    THE ORDINARY COURSE OF BUSINESS DEFENSE

Hechinger's opposition to the OCB defense is based on one oft-repeated proposition, i.e., that UFP imposed different, and more stringent, terms on Hechinger during the preference period. Quoting the trial court, Hechinger argued that these new terms were "so extreme, and so out of character with the long standing relationship between the parties, that [they] may only be characterized as preferential." Hechinger Brief at p. 23. Hechinger failed to knowledge, however, that these new terms were applied prospectively, to new shipments only, and that without them, Hechinger would not have received nearly $16,500,000 in new goods from UFP during the preference period. Neither Hechinger, nor the trial court, articulated any basis in the language or the purpose of the preference rules for excluding payments for such transfers from the OCB defense.

(a)    **Faster Payments for New Shipments are not only Preference Immune, But Necessary to Keep Distressed Businesses in Operation.**

Hechinger failed to acknowledge a critical distinction in its analysis - that UFP shortened Hechinger's payment terms, and reduced its credit limit, on a strictly prospective basis, for new transactions only. TT 44. In reliance on these new terms, UFP transferred nearly $16,500,000 of new goods to the Debtor during the preference period. Hechinger then immediately converted these goods into cash at retail, yielding a huge economic benefit to the estate and to other creditors. None of this would have been possible without the new terms, and none of it will be possible for other debtors in the future if the courts hold that arrangements of this type can be set aside as preferences. Neither the language of the Code, nor the policy objectives of the OCB defense, mandate this unnecessary result.

Hechinger quoted *In re Molded Acoustical Products, Inc.,* 18 F.3d 217, 224 (3rd Cir. 1994) for the proposition that the preference rules are built on a policy favoring equitable treatment among creditors:

> The preference provisions are designed not to disturb normal debtor/creditor relationships, but to derail unusual ones which threaten to heighten the likelihood of the debtor filing for bankruptcy at all and, should that contingency materialize, to then disrupt the paramount bankruptcy policy of the equitable treatment of creditors.

18 F.3d at 224. This policy requires, however, that UFP be allowed to keep the payments it received for new shipments during the preference period, not that UFP give such payments back.

The policy of equitable distribution applies only to similarly situated creditors. See, 5 *Collier on Bankruptcy*, 547-9 (cited in, *In re First Jersey Securities, Inc.,* 180 F.3d 504 (3rd Cir. 1999)). If one of several creditors holding old receivables pressures the debtor to pay those old receivables, while other creditors with similar old receivables are not paid (or not paid as much), the goal of equality of distribution is frustrated and the payments to the preferred credit should be

11

disgorged.  But a creditor who sends $16,500,000 of new goods to the debtor during the preference period is not "similarly situated" to a garden variety creditor holding old debt.  Since the new shipments are themselves a benefit to the estate (and a benefit to existing creditors), paying for them does not harm other creditors, and is not preferential in the decisive respect.  In fact, other creditors in the estate would be preferred at UFP's expense if the preference period payments UFP received were disgorged.  This would frustrate, rather than accomplish, the policy objectives of the Code.[10]

Hechinger suggested in its response Brief that if UFP wanted to engage in preference-immune transactions with Hechinger, it should have resorted to "cash in advance" or "cash on delivery" terms.  See, Hechinger Brief at 24.  Hechinger further suggested that "Congress did not intend for a vendor such as UFP to obtain payment pursuant to severe collection pressure in order to accomplish its purpose."  *Id.*  So, according to Hechinger, a creditor who encounters a troubled customer and thus a heightened credit risk may not lessen that risk by shortening terms; the only safe option is to eliminate the customer's terms altogether.  By embracing this position, Hechinger would drive vendors away from credit transactions with customers in financial distress.  This is contrary to the core purpose of the Code, which is to encourage vendors to continue credit sales to distressed customers.  See, UFP Brief at 24 through 25.

Hechinger's interpretation is also needlessly illogical.  If Hechinger is correct, a payment one minute before shipment is completely preference immune, while a payment one minute after shipment is absolutely recoverable.  The economic realities of each payment, however, are virtually identical, leaving no justification for such disparate treatment.  There is nothing in the

---

[10] UFP could not possible have been "preferred" by Hechinger in the traditional sense, because UFP either had no old debt to prefer, or did not change the payment and credit terms for whatever small amount of old debt remained outstanding. TT 44.  UFP was owed nothing before the preference period started, and was in fact "overpaid" for much of the time after the new terms were imposed in February of 1999. See, UFP initial Brief at 3.  There was therefore no old debt with respect to which UFP could be preferred.

language or history of the (c)(2) defense that would support treating these two payments so differently.

The better view, and the one more consonant with the policy objectives of the Code, is the one that allows creditors a "safe harbor" for all payments within terms. See UFP Brief at 19 through 21. This will permit debtors to take advantage of whatever flexibility is reasonable under the circumstances, while at the same time not forcing creditors either to stand on 30-day terms (which they will not do) or retreat all the way to cash on delivery. Both the trial court and Hechinger acknowledged that "some flexibility" is necessary to fulfill the purpose of the Code (and thus both acknowledge, at least indirectly, that a change in terms does not automatically destroy the OCB defense), but neither explained why **any** offer of credit flexibility should take the resulting transactions outside the OCB defense.

### (b)    Contrary to Hechinger's Argument, Lower Credit Limits and Shorter Terms Did Not Occur for the First Time Between the Parties in 1999.

Hechinger's assertion that lower credit limits and shorter terms were unprecedented in the relations between UFP and Hechinger is not so. During the peak season in 1998, a year prior to the preference period, the parties agreed to 5-day terms and UFP eliminated Hechinger's credit limit and stopped shipping pending an over-night payment from Hechinger of $1,433,880. See, UFP Brief at 24. What occurred in 1998 was a not-too-dissimilar from what occurred a year later, in 1999. Hechinger failed in its response Brief to address, or even mention, this evidence. It also failed to mention the un-contradicted evidence showing that the transactions between the parties for many years were conducted on a fast-pay basis, resulting in payments of more that $10,000,000 in 1998 that were made in 10 days or less. *Id.* The point is that rapid payments were the norm between these parties, not the exception.

13

Hechinger also failed to address or mention the fact that some small percentage of transactions between the parties were typically paid late, due to billing disputes, paper work problems, and the like. UFP Brief at 29-30. This is quite customary when such huge volumes of sales are involved. The trend continued during the preference period, resulting in payments beyond 8 days about 2.5% of the time. *Id.* When payments of this type are routine between the parties, the OCB defense protects them. See, e.g., *In re Talono Pizza Products, Corp.,* 3 F.3d 1029, 1032 (7th Cir. 1993). The $265,099 paid during the preference period beyond 8 days (and not otherwise protected by the (c)(1) defense) is therefore not recoverable by Hechinger. Hechinger has essentially conceded this point by not addressing or contesting it.

## IV.    SPOLIATION

The spoliation issue is now largely moot, given the concession in Hechinger's response Brief that it intended its preference period payments as remitted. The purpose of UFP's spoliation motion was to highlight the unfairness that occurs when a litigant destroys all of its physical records, preserving only a scattered and incomplete set of electronic documents, and then denies a fact-sensitive issue like "intent." Hechinger has now admitted that it acted with the requisite intent, so the issue over Hechinger's of records has become largely moot.

## V.    PRE-JUDGMENT INTEREST

Hechinger is not entitled to pre-judgment interest. The trial court was correct not to award it.

The general rule is that the Bankruptcy Court has discretion to allow (or refuse) pre-judgment interest, but only from the date of the Complaint, and then only if the defendant does not have a defense that can be asserted in good faith. *See, e.g., In re Milwaukee Cheese Wisconsin, Inc.,* 112 F.3d 845 (7th Cir. 1997); *In re Armstrong,* 260 Bankr. 454 (E.D. Ark.

2001), aff'd 291 F.3d 517 (8th Cir. 2002); *In re USN Communications, Inc.*, 280 Bankr. 573 (Bankr. Del. 2002).

The proper exercise of the Court's discretion regarding pre-judgment interest hinges on whether the defendant was "wholly" without a defense. If the defendant had no colorable defenses, then pre-judgment interest is allowable. By contrast, if the defendant had colorable defenses, pre-judgment interest is not allowable. *See, In re Armstrong*, 260 Bankr. at 459 (affirming the decision of the Bankruptcy Court, which had denied pre-judgment interest on the grounds that the defendant was not "wholly lacking in a worthy or credible defense"); *Sacred Heart Hospital of Norristown v. E. B. O'Reilly Serv'g Corp. (In re Sacred Heart Hospital of Norristown)*, 200 Bankr. 114 (Bankr. Pa. 1996) (finding that the debtor was not entitled to any pre-judgment interest where "the defendant had an admittedly valid § 547(c)(4) defense to more than half of the amount originally claimed and a respectable § 547(c)(2) defense as to the balance").

The trial court ruled in connection with cross motions for summary judgment that UFP had a valid defense under §547(c)(4) to approximately 40% of the claims asserted by Hechinger, close to the 50% in the *Sacred Heart Hospital* case.[11] On the eve of trial, Hechinger waived all of its opposition to UFP's (c)(4) defense, leaving in dispute only 5% of the money Hechinger originally sought to recover. See, Joint Pre-trial Memorandum. UFP was nevertheless forced to conduct discovery with respect to all $16,500,000, and to prosecute and defend motions and cross-motions for summary judgment, during which Hechinger vigorously fought for all $16,500,000. These points were all argued to the trial court, and were obviously the basis for the

---

[11] The trail court said, however, that it was inclined to extend the defense to 95% of the amount sought by Hechinger, depending on the outcome of UFP's other defenses. See, Opinion on Summary Judgment Motions .

trail court's decision to deny pre-judgment interest. Hechinger's suggestion that it cannot discern the basis for the trail court's ruling is therefore incorrect.

Hechinger's approach is flawed for the addition reason that it seeks interest from June of 1999, years before it filed its complaint against UFP. The cases are quite clear that, even when the trail court exercises it its discretion in favor of allowing pre-judgment interest, it can do so only from the date of the complaint, especially when, as in the present case, the complaint is not filed until the statute of limitations is about to expire. *USN Communications,* 280 Bankr. at 581. For this and the other reasons set forth above, the trial court's ruling on pre-judgment interest should be affirmed.

## VI.    CONCLUSION

For all of the above reasons, UFP prays for an order (1) REVERSING the judgment of the trial court disallowing the "contemporaneous exchange" defense and the "ordinary course of

business" defense, (2) AFFIRMING the judgment of the trial court disallowing pre-judgment interest, and (3) REMANDING this case to the to the trial court for entry of an order consistent with this Court's ruling on appeal.

Respectfully submitted:

MONZACK AND MONACO, P.A.

Dated: December 8, 2005

By: _Kevin J Mangan_____

Kevin M. Mangan (#3810)
1201 N. Orange Street, Suite 400
P.O. Box 2031
Wilmington, DE  19899
(302) 656-8162
kmangan@monlaw.com

and

VARNUM RIDDERING SCHMIDT & HOWLETT LLP
Michael S. McElwee (P36088)
333 Bridge Street, N.W., Suite 1700
Grand Rapids, MI  49504
(616) 336-6000
Attorneys for Defendants

17

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | BK No. 99-02261-PJW |
| | (Jointly Administered) |
| Hechinger Investment Company of Delaware, Inc., et al. | |
| | Chapter 11 |
| Debtor | |
| | Adv. No. 01-3170 |
| Hechinger Investment Company Of Delaware, Inc., et al., Debtors In Possession, | Civil Action Nos. 05-497 and 05-498 (KAJ) |
| Plaintiff(s), | |
| vs. | |
| Universal Forest Products, Inc. | |
| Defendant. | |

## CERTIFICATE OF SERVICE

I, Lorraine Diaz, certify that I am not less than 18 years of age, and that service of the Universal Forest Product's Reply To Hechinger's Response And Response To Hechinger's Appeal Regarding Pre-Judgment Interest was made on December 8, 2005 upon:

**Via Hand Delivery**
John T. Carroll, Esquire
Cozen O'Connor
1201 North Market Street, Ste. 1400
Wilmington, DE 19801

**Via Federal Express**
Joseph L. Steinfeld, Jr., Esquire
A-S-K Financial LLP
2600 Eagan Woods Drive, Ste. 220
Eagan, MN 55121

Under penalty of perjury, I declare that the foregoing is true and correct.

Dated:  December 8, 2005

Lorraine Diaz.

Document #: 50196