PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 06-2166 and 06-2229
_____

IN RE: HECHINGER INVESTMENT COMPANY
OF DELAWARE, INC., ET AL.

Debtors

HECHINGER INVESTMENT COMPANY OF
DELAWARE, INC.

v.

UNIVERSAL FOREST PRODUCTS, INC.,

Appellant No. 06-2166

_____

*(continued)*

_____

IN RE: HECHINGER INVESTMENT COMPANY
OF DELAWARE, INC., ET AL.

Debtors

HECHINGER INVESTMENT COMPANY OF
DELAWARE, INC.

v.

UNIVERSAL FOREST PRODUCTS, INC.

Hechinger Liquidation Trust, as successor in
interest to Hechinger Investment Company of
Delaware Inc., et al., Debtors in Possession,

Appellant No. 06-2229

_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 05-cv-00497)
District Judge: Honorable Kent A. Jordan

_____

Argued on March 28, 2007

Before:  RENDELL and CHAGARES,* <u>Circuit Judges</u>.

(Filed:  June 7, 2007)

Kevin J. Mangan
Monzack & Monaco
1201 North Orange Street
400 Commerce Center
Wilmington, DE   19899

    **-and-**

*(continued)*

_____

  *  The Honorable Maryanne Trump Barry participated in
the oral argument and panel conference and joined in
the decision on this case, but discovered facts causing
her to recuse from this matter prior to filing of the
Opinion.  The remaining judges are unanimous in this
decision, and this Opinion and Judgment are therefore
being filed by a quorum of the panel.

Michael S. McElwee    **[ARGUED]**
Barnum, Riddering, Schmidt & Hewlett
333 Bridge Street, N.W., Suite 1700
Grand Rapids, MI  49504
*Counsel for Appellant/Cross Appellee*
*Universal Forest Products, Inc.; and Hechinger*
*Liquidation Trust, as successor in interest to*
*Hechinger Investment Company of Delaware Inc., et al.,*
*Debtors in Possession*

Joseph L. Steinfeld, Jr.  **[ARGUED]**
Karen M. Scheibe
A.S.K. Financial
2600 Eagan Woods Drive, Suite 220
Eagan, MN  55121
*Counsel for Appellee/Cross Appellant*
*Hechinger Investment Company of Delaware, Inc.*

_____

## OPINION OF THE COURT

_____

RENDELL, <u>Circuit Judge</u>.

This case arises out of the bankruptcy proceedings of Hechinger Investment Company of Delaware, Inc. ("Hechinger").  Hechinger filed a complaint in the Bankruptcy Court against its creditor, Universal Forest Products ("UFP"), to avoid and recover preferential transfers from UFP, pursuant to

4

11 U.S.C. §§ 547 and 550. The Bankruptcy Court rejected UFP's defenses that the transfers were either contemporaneous exchanges for new value under Bankruptcy Code § 547(c)(1) or made in the ordinary course of business under § 547(c)(2), and denied UFP's motion for an adverse evidentiary inference against Hechinger on the ground of spoliation. It also denied Hechinger's motion for prejudgment interest. The District Court affirmed. Both sides now appeal.

## I.

UFP, a leading manufacturer of treated lumber products, began its business relationship with Hechinger some 15 years prior to Hechinger's June 11, 1999 bankruptcy filing. Prior to February 1999, Hechinger was one of UFP's biggest customers. However, Hechinger's financial condition worsened in 1999 and UFP became concerned about continuing to sell goods to Hechinger on credit.

On February 4, 1999, UFP and Hechinger had a meeting to discuss Hechinger's financial situation and possible solutions in order to allow the companies to maintain their business relationship during the upcoming spring season, when Hechinger's demand for lumber products was the greatest. Prior to this meeting, Hechinger had an open line of credit with UFP on terms of "1% 10 days, net 30, with a 7-day mail float." Under this arrangement, Hechinger could earn a 1% price reduction for invoices paid within the "discount period,"

namely, ten days plus a seven-day grace period for payments
made by mail.  App. 207.  Hechinger had up to 30 days to pay
in order for the payment to be considered prompt.  *Id*.
Hechinger paid UFP by check accompanied by remittance
advices that matched each payment to particular previous
invoices.  During the three years prior to Hechinger's
bankruptcy filing, Hechinger made most of its payments to UFP
within the "discount period."  App. 906.  As of February 4,
1999, Hechinger's account reflected no amount past due, and
$37,148 coming due within the next 30 days.  App. 713.

At the February 4 meeting, UFP presented Hechinger
with four different options to allow the business relationship of
the parties to continue.  Hechinger agreed to a $1 million credit
limit for future purchases and its credit terms were reduced to
"1%, 7 days, net 8," meaning that Hechinger could earn a 1%
price reduction for invoices paid within the seven day "discount
period," and had up to eight days to pay in order for the payment
to be considered prompt.  Hechinger also agreed to remit
payments to UFP by wire transfer, instead of check.  Hechinger
wired payments in lump sum amounts of $500,000 or
$1 million, prior to sending remittance advices to UFP.  The
changed terms of Hechinger's credit arrangements with UFP
required Hechinger to make larger and more frequent payments
to UFP because Hechinger placed orders for between $160,000
and $250,000 worth of product per day.  Hechinger made a total
of 22 wire transfers during the "preference period," which ran
from March 13 to June 11, 1999.  This equates to a wire nearly

6

every 2.9 days.  Hechinger usually made wire transfers in the amount of the credit limit, which was $1 million for most of this period.[1]  The payments reduced the outstanding balance in Hechinger's UFP account and replenished Hechinger's $1 million line of credit, so that Hechinger could order additional goods from UFP.[2]

At the time that Hechinger made each wire transfer, it did not know which shipments were covered by the transfer. Hechinger sent remittance advices to UFP after making payments, in order to explain how UFP should match the payments to the invoices that UFP created.  According to these remittance advices, some of Hechinger's payments during the preference period were "advance payments," meaning payments made prior to shipment of the goods.  Hechinger's payments during the preference period were usually made up to ten days

---

[1]Hechinger's credit limit was briefly reduced to $500,000 and was returned to $1 million on April 8.  App. 1333.  For four or five days after the limit was returned to $1 million, Hechinger continued to send wires in the amount of the previous credit limit of $500,000, but later began sending $1 million wires.

[2]There is a dispute between the parties as to whether they intended unshipped orders to have counted against Hechinger's available credit.  UFP argues that the parties agreed that both shipped and unshipped orders were counted against the credit limit, while Hechinger argues that only shipped orders were included.

7

before shipment, to eight days after shipment, with the greatest concentration of payments occurring on the date of shipment. App. 905.

Hechinger filed for Chapter 11 bankruptcy protection on June 11, 1999. On June 5, 2001, Hechinger filed a complaint against UFP to avoid and recover preferential transfers under 11 U.S.C. § 547 and § 550. Hechinger originally sought to recover $16,703,604.57, the full amount of the payments made to UFP during the 90-day period prior to Hechinger's June 11, 1999 filing. Before trial, Hechinger conceded that $6,576,603.36 of these payments were advance payments and therefore, by definition, not recoverable under § 547 as payments for or on account of an antecedent debt. The parties also stipulated that the "net preference" at issue at trial, potentially subject to UFP's § 547(c)(1) and § 547(c)(2) defenses, was $1,004,216.03 and that Hechinger had established a prima facie case under § 547(b) that these transfers were avoidable. App. 39.

Prior to trial, UFP filed a spoliation motion with the Bankruptcy Court, asking the Court to draw an adverse inference against Hechinger because, prior to the filing of its complaint, Hechinger destroyed documents that might have helped UFP prove that Hechinger intended its preference period payments to be contemporaneous exchanges for new value under § 547(c)(1). The Court denied the motion, without discussion, in October 2004.

8

A trial in the Bankruptcy Court commenced on February 25, 2005, with the main issue being UFP's contention that $1,004,216 in payments were not avoidable based on § 547(c)(1) and § 547(c)(2) of the Bankruptcy Code. These sections provide that:

> (c) The trustee may not avoid under this section a transfer--
>
> (1) to the extent that such transfer was--
>
>> (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
>>
>> (B) in fact a substantially contemporaneous exchange;
>
> (2) to the extent that such transfer was--
>
>> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
>>
>> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
>>
>> (C) made according to ordinary business terms;

Accordingly, UFP urged that, although the payments may have been on account of antecedent debts, they were nonetheless not avoidable because they were contemporaneous exchanges for new value under § 547(c)(1), and, alternatively, because they were made in the ordinary course of business under § 547(c)(2).

The Bankruptcy Court entered judgment in favor of Hechinger on June 16, 2005 in the amount of $1,004,216. With respect to whether the transfers were intended as contemporaneous exchanges for new value under § 547(c)(1), the Court stated that "the nature of a credit relationship is inconsistent with the intent which is required in order to sustain the § 547(c)(1) defense." *In re Hechinger Inv. Co. of Del.*, 326 B.R. 282, 289 (Bankr. D. Del. 2005). It also concluded that the transfers were not made in the ordinary course of business between the parties under § 547(c)(2)(B) because the transfers were made under vastly different conditions from those that had previously governed the relationship of the parties. *Id.* at 292. The Court further found that the transfers were not made according to ordinary business terms under § 547(c)(2)(C) because the terms varied substantially from those normally employed by UFP with other customers similar to Hechinger. *Id.* at 293. Hechinger had requested prejudgment interest to compensate it in full for the "value" of the payments it recovered, but the Bankruptcy Court denied this request without any discussion. *Id.* at 294.

Both parties appealed the adverse rulings to the District Court. Challenging the Bankruptcy Court's rejection of UFP's contemporaneous exchange defense under § 547(c)(1), UFP argued that the Bankruptcy Court's ruling was grounded in an error of law regarding the nature of the transactions and the intent required under § 547(c)(1). The District Court disagreed, concluding that the Bankruptcy Court did not commit legal error

in stating that "the § 547(c)(1) defense may not be applied to credit transactions." *In re Hechinger Inv. Co. of Del.*, 339 B.R. 332, 336 (D. Del. 2006). The District Court did not read this statement as a legal pronouncement that credit transactions are categorically excluded from § 547(c)(1). Rather, it understood this passage to signify that the Bankruptcy Court had found that the parties intended a credit, rather than a cash, relationship. *Id.* The District Court then rejected UFP's other challenges to the judgment of the Bankruptcy Court and Hechinger's challenge to the denial of prejudgment interest, and affirmed the Bankruptcy Court's order. *Id.* at 36-38. This appeal followed.

## II.

The District Court had jurisdiction over the appeal of the Bankruptcy Court's orders pursuant to 28 U.S.C. § 158(a)(1). We have jurisdiction to review the District Court's decision pursuant to 28 U.S.C. § 158(d)(1). "Our review of the District Court's decision effectively amounts to review of the bankruptcy court's opinion in the first instance," *In re Hechinger Inv. Co. of Del.*, 298 F.3d 219, 224 (3d Cir. 2002), because our standard of review is "the same as that exercised by the District Court over the decision of the Bankruptcy Court," *In re Schick*, 418 F.3d 321, 323 (3d Cir. 2005).

We review the Bankruptcy Court's findings of fact for clear error and exercise plenary review over questions of law. *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 209-10 (3d Cir. 2006). We review the Bankruptcy Court's denial of an award of prejudgment interest for abuse of discretion. *In re Investment Bankers, Inc.*, 4 F.3d 1556, 1566 (10th Cir. 1993). We also review the denial of UFP's motion seeking an evidentiary inference based on spoliation of evidence for abuse of

discretion. *See Complaint of Consol. Coal Co.*, 123 F.3d 126, 131 (3d Cir. 1997) (reviewing district court's decision on spoliation motion for abuse of discretion).

## A. The Contemporaneous Exchange Defense

To prove that the transfers were not avoidable because they fell within the contemporaneous exchange defense under § 547(c)(1), UFP had to show that the transfers were (i) intended by the debtor and the creditor to be a contemporaneous exchange for new value given to the debtor; and (ii) in fact a substantially contemporaneous exchange. *In re Spada*, 903 F.2d 971, 974 -75 (3d Cir. 1990). "The critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange." *Id.* at 975.

The Bankruptcy Court found that the disputed transfers were not intended by the parties to be contemporaneous exchanges because the transfers were credit transactions. In reaching this result, the Court relied upon several factually distinguishable cases, none of which stand for the proposition that parties can never intend credit transactions to be contemporaneous exchanges under § 547(c)(1)(A).[3]    We

---

[3]    The Court cited *Kallen v. Litas*, 47 B.R. 977 (N.D. Ill. 1985), and two later cases that cite *Kallen*, for the proposition that it is "well established that the § 547(c)(1) defense may not be applied to credit transactions." *In re Hechinger Inv. Co.*, 326 B.R. at 289. However, this was not the holding in *Kallen*. The *Kallen* Court stated that § 547(c)(1) "was meant to apply to cash or quasi-cash transactions," but did not rely on any distinction between cash and credit transactions in its holding. *Kallen*,

12

disagree with the Bankruptcy Court's conclusion. Indeed, it would appear that § 547(c)(1) covers little other than credit transactions. The § 547(c)(1) defense applies only to transfers that the debtor has shown are payments on an "antecedent debt" under § 547(b). *See* 11 U.S.C. § 547(b)(2) (definition of avoidable transfers). If there is no delay between when the debt arises and payment of the obligation, then the transfer is outside the scope of § 547(b), and § 547(c)(1) is not implicated. The existence of a delay between the creation of a debt and its payment is a hallmark of a credit relationship, which is, by definition, a relationship in which the creditor entrusts the debtor with goods without present payment. OXFORD ENGLISH DICTIONARY (2d ed. 1989) (defining "credit" as "[t]rust or confidence in a buyer's ability and intention to pay at some future time, exhibited by entrusting him with goods, etc. without present payment.").

We do not think that the District Court's interpretation of the Bankruptcy Court's order – namely, as concluding that the parties intended to have a credit relationship – necessarily

---

47 B.R. at 983 & n.7.

The Bankruptcy Court also relied upon *In re Contempri Homes, Inc.*, 269 B.R. 124 (Bankr. M.D. Pa. 2001), in which the court rejected the defendant's § 547(c)(1) defense based on a finding that both parties intended the debtor's payments to be applied to old invoices. *Id.* at 129. The court did not, however, find that the parties lacked the requisite intent based on the fact that the transactions were styled as "credit transactions." Instead, the court concluded that the parties could not have intended a contemporaneous exchange because the invoices to which the payments were applied were "dated," "old" and "aged." *Id.* at 128.

13

resolves the question. The inquiry still remains: even if a credit relationship was intended, was it nonetheless their intent that the ongoing payments would be contemporaneous exchanges for new value? A court may find the parties intended a contemporaneous exchange for new value even when the transaction is styled as a "credit" transaction. *See In re Payless Cashways, Inc.*, 306 B.R. 243 (8th Cir. BAP 2004), *aff'd*, 394 F.3d 1082 (8th Cir. 2005). The question is one of intent, and although a delay between the incurrence of the debt and its payment can evidence that the exchange was not intended to be contemporaneous, the passage of time does not necessarily negate intent. In *In re Payless Cashways*, for example, the debtor generally paid the creditor for specific shipments some time after the goods were shipped, but before or at the time that the shipments arrived at the debtor's facility. *Id.* at 247. The court concluded that the parties intended the transfers to be part of a contemporaneous exchange for new value. The court noted that the debtor and creditor agreed to credit terms that would match up the date of the actual delivery of the goods purchased by the debtor with the date of the debtor's obligation to wire payment for the goods to the creditor. *Id.* at 246. The court also put great weight on the fact that the contracts were "destination contracts," meaning that the creditor could have refused to deliver the goods if the debtor had failed to make payment before the delivery arrived. *Id.* at 250, 254.

Similarly, the Bankruptcy Court in *In re CCG 1355, Inc.*, 276 B.R. 377, 386 (Bankr. D.N.J. 2002), found that a debtor's payment, made seven to eleven days after shipment of the goods but prior to receipt of the creditor's invoices, was intended by the parties as a "contemporaneous exchange" for new value under § 547(c)(1)(A). The court did not specify whether the debtor had arranged credit terms with the creditor. *See also In*

14

*re Bridge Inform. Sys., Inc.*, 321 B.R. 247, 256 (Bankr. E.D. Mo. 2005) (finding that parties intended a contemporaneous exchange for new value when they agreed that debtor would pay creditor within one business day following its receipt of invoice for services provided the previous week); *In re Anderson-Smith & Assoc., Inc.*, 188 B.R. 679, 689 (Bankr. N.D. Ala. 1995) (finding that parties intended a contemporaneous exchange for new value when creditor refused to deliver goods without debtor's assurance of payment).     The payments at issue in the present case were, for the most part, made even closer to the date of shipment than the payments in *In re Payless Cashways* and *In re CCG*.  The parties stipulated that over half of the payments that Hechinger sought to avoid were made within five days of the date of the invoice (which was also the date that the orders were shipped).  App. 219.  The Bankruptcy Court, however, did not address the evidence that the "outstanding debt" to which the transfers were applied was in most cases less than six days old.  Instead, the Court categorized the transfers at issue as credit transactions and then found, as a matter of law, that this finding compelled it to conclude that the debtor did not intend the transfers to be part of a contemporaneous exchange for new value.

     We conclude that the Bankruptcy Court erred in holding that the fact that the parties had a credit relationship precluded, as a matter of law, a finding that Hechinger intended the transfers to be part of a contemporaneous exchange for new value.  We do not opine as to whether there is sufficient evidence in the record for the Bankruptcy Court to have found that UFP failed to prove that the transfers were intended to be

15

contemporaneous exchanges for new value.[4]    Rather, we conclude only that the Bankruptcy Court did not make the necessary finding as to what the parties intended.  Instead, the Court decided that Hechinger did not intend a contemporaneous exchange based on the erroneous legal conclusion that the existence of a credit relationship between the parties was determinative.  Whether the parties intended a contemporaneous exchange is a question of fact to be decided in the first instance by the factfinder.  *In re Spada*, 903 F.2d 971, 975 (3d Cir. 1990) ("The determination of such intent is a question of fact.").  We will accordingly remand to the District Court with instructions to remand to the Bankruptcy Court to consider whether Hechinger and UFP intended the transfers at issue to be contemporaneous exchanges for new value, with the understanding that transfers made under "credit" terms are not, as matter of law, categorically excluded from the scope of the § 547(c)(1) defense to avoidance.

---

[4]We do note that Hechinger arguably may have intended that its transfers would be part of a contemporaneous exchange for "new value" in the form of a renewed line of credit, which Hechinger received on the date of the payment and immediately made use of by charging new shipments to its account with UFP.  *See In re Roemig*, 123 B.R. 405, 408 (Bankr. D.N.M. 1991) (finding $41.40 of debtors' payment to pay down line of credit was intended as a "contemporaneous exchange for new value" because debtors transferred money to pay down their credit card on the same day as they charged a purchase of this amount to their credit card).

16

## B. The Ordinary Course of Business Defense

To prove that the transfers were not avoidable by Hechinger as preferential transfers under § 547(c)(2), UFP had the burden to prove that the transfers were "(A) incurred in the ordinary course of both the debtor's and the creditor's business; (B) made and received in the ordinary course of their respective businesses; and (C) 'made according to ordinary business terms.'" *In re Molded Acoustical Products, Inc.*, 18 F.3d 217, 219 (3d Cir. 1994) (quoting 11 U.S.C. § 547(c)(2)). Neither "ordinary course of business" nor "ordinary business terms" is defined in the Bankruptcy Code. *In re J.P. Fyfe, Inc.*, 891 F.2d 66, 70 (3d Cir. 1989). The parties agreed that UFP proved the first element. The trial therefore focused on subsections B and C.

Starting with subsection B of the defense, UFP argued that all payments made by Hechinger within the new credit terms (i.e., within eight days of the invoice date) presumptively qualified as payments made in the "ordinary" course of the parties' business under § 547(c)(2)(B).[5] UFP maintained that *In*

---

[5]Although $ 265,099.00 of the amount at issue in this case was paid outside of credit terms (i.e., nine or more days after the date of invoice), UFP contends that these late payments should also be considered "ordinary" because the percentage of late payments that Hechinger made during the preference period was roughly equivalent to the historical percentage. However, these late payments, like the timely payments at issue, were made according to the "extreme" new credit terms instituted by UFP in February, 1999. The Bankruptcy Court found that all of the transfers made under these new terms were not made according to the ordinary course of business.

17

*re Daedalean, Inc.*, 193 B.R. 204, 212 (Bankr. D. Md. 1996), established this presumption of ordinariness. However, the *Daedalean* Court did not address the presumptive ordinariness of payments made within agreed credit terms in its holding because all of the payments at issue in the case were made *outside* of the agreed terms. We agree with the Bankruptcy Court that we should not apply such a presumption; rather, each fact pattern must be examined to assess "ordinariness" in the context of the relationship of the parties over time.[6]

The Bankruptcy Court examined the relationship between the parties and concluded that the payments made by Hechinger to UFP during the preference period were not "made in the ordinary course of business or financial affairs of the debtor and the transferee" within the meaning of § 547(c)(2)(B) because the changes UFP had imposed on Hechinger were "so extreme, and so out of character with the long historical relationship between these parties." *In re Hechinger Inv. Co.*, 326 B.R. at 292. UFP likens this case to *In re Tennessee Valley Steel Corp.*, 201 B.R. 927 (Bankr. E.D. Tenn. 1996), where the court found that the debtor's preference period payments were made within the ordinary course of the parties' dealings, even though the payments made during the preference period were not as timely as before, and some were even made several days after the invoice due date. However, *In re Tennessee Valley* did not

---

[6]Other courts have also declined to adopt a presumption that payments made within credit terms are ordinary. *See In re TWA, Inc. Post Confirmation Estate*, 327 B.R. 706, 709 (Bankr. D. Del. 2005) (finding that transfer made during the preference period was not ordinary because, although it was made within the contract terms, the history of dealings between the parties was that of payments being made well outside such terms).

involve any change in the parties' credit terms during or immediately before the beginning of the preference period. If Hechinger and UFP had not changed their credit terms immediately prior to the beginning of the preference period, the accelerated timing of Hechinger's payments during this period would be less significant. Here, however, where there were changes in the credit arrangements that were "so extreme, and so out of character with the long historical relationship between these parties," this change and the resultant change in the timing of Hechinger's payments was appropriately considered by the Bankruptcy Court. *See In re M Group, Inc.*, 308 B.R. 697, 702 (Bankr. D. Del. 2004) (finding that payments were not ordinary under §547(c)(2)(B) where "payment schedules here were altered as bankruptcy became a possibility" and the ordinary course of business between the parties consisted of making payments on a much more random and haphazard basis than occurred during the preference period).

This case is more closely analogous to *In re Roberds, Inc.*, 315 B.R. 443 (Bankr. S.D. Ohio 2004). There, the court found that the creditor failed to prove that the transfers were made and received in the ordinary course of the parties' respective businesses under § 547(c)(2)(B) because the creditor changed the parties' credit arrangements during the preference period. During the period after the change:

> (1) the credit limit of $750,000 was vigorously enforced by the Creditor; (2) credit holds, involving individual negotiations resulting in payments satisfactory to the Creditor prior to the shipment of furniture, were in effect; (3) payment terms were changed; (4) the Debtor paid, on average, earlier than Net 30 terms; and (5) other

19

creditors were being significantly delayed, or denied, in the receipt of their payments while this Creditor was receiving accelerated payments and none of these events had ever occurred in the parties' history.

*Id.* at 467 (internal footnote omitted). Based on these factual findings, the court concluded that the creditor failed to prove that the transfers that occurred during this portion of the preference period were made and received in the ordinary course of the parties' businesses under §547(c)(2)(B).

Like the debtor in *Roberds*, Hechinger was pressured to make accelerated payments during the preference period because of UFP's vigorous enforcement of its credit limit. During the preference period, 96.5% of Hechinger's payments were made 0-10 days from invoice, while during the comparable three-month periods in 1996, 1997 and 1998, 10% of Hechinger's payments were made 0-10 days from the date of invoice. App. 1342. During the preference period, Hechinger's outstanding daily balance with UFP ranged from $1 million owed to a $1 million credit balance. During the same 90-day period in 1998, Hechinger's daily balance was always greater than $1 million and was generally between $3 million and $4 million. *Id.*

UFP argues that this alteration in terms was not that significant because, previously, the parties had operated under an even more accelerated payment schedule and had used a wire transfer. In June of 1998, it was agreed that Hechinger would make payments within five days of the invoice date and Hechinger sent UFP a check for $1,433,800 via FedEx overnight delivery on June 9. App. 449, 958-60. However, these

20

arrangements were as a result of an "unusual dispute regarding some past due invoices" and were not the terms employed by the parties during the rest of their fifteen year relationship. Appellee Br. 51 nn. 10 & 11.

The Bankruptcy Court did not find the credit limit imposed on Hechinger to be the deciding factor in its determination that the transfers did not fall within the § 547(c)(2) defense to preference avoidance. Rather, the Bankruptcy Court considered the credit limit as well as the other changes in the credit arrangements of the parties, such as the change in terms to 1% 7 days, net 8 and the requirement that Hechinger make payments by wire transfer. *In re Hechinger Inv. Co.*, 326 B.R. at 292. The Bankruptcy Court also properly considered the length of time the parties had engaged in the type of dealing at issue, the way the payments were made, whether there appeared to be any unusual action by either the debtor or creditor to collect or pay on the debt, and whether the creditor did anything to gain an advantage in light of the debtor's deteriorating financial condition. *See In re Logan Square E.*, 254 B.R. 850, 855 (Bankr. E.D. Pa. 2000) (listing such factors as appropriate considerations in determining whether transfers are "ordinary"). Each of these factors weighed in favor of a finding that the disputed transfers were not "ordinary" under §547(c)(2)(B). In essence, a month before the beginning of the preference period, UFP tightened its credit terms, imposed a credit limit, required Hechinger to make payments by wire transfer in large, lump-sum amounts, and required Hechinger to send remittance advices after making payment on invoices. This was not the ordinary course of dealing between the parties. The Bankruptcy Court did not clearly err in finding that the new credit arrangements between the parties were "extreme" and "out of character with the long historical relationship between

21

these parties." Based on this finding, the Court properly concluded that UFP failed to prove that the transfers were "made in the ordinary course of business or financial affairs of the debtor and the transferee."

The Bankruptcy Court also noted that UFP failed to prove the third element of the § 547(c)(2) defense, namely, that the transfers were made according to "ordinary business terms." We need not, however, discuss this aspect of its ruling because UFP's failure to demonstrate that the transfers were "made in the ordinary course of business or financial affairs of the debtor and the transferee" precludes the § 547(c)(2) defense altogether.

### C.  The Spoliation Motion

UFP also appeals the Bankruptcy Court's denial of its motion for an evidentiary inference in its favor that Hechinger intended its transfers during the preference period to be contemporaneous exchanges for new value under §547(c)(1) because, it argued, Hechinger improperly destroyed records prior to discovery that might have assisted UFP in proving Hechinger's intent. Hechinger acknowledged that it destroyed various records in September 1999, after filing for bankruptcy, in order to reduce the amount of space occupied by the company.

In *Schmid v. Milwaukee Electric Tool Corp.*, 13 F.3d 76 (3d Cir. 1994), we explained the history of the "spoliation inference:"

> Since the early 17th century, courts have admitted evidence tending to show that a party destroyed evidence relevant to the dispute being litigated.

> Such evidence permitted an inference, the
> "spoliation inference," that the destroyed
> evidence would have been unfavorable to the
> position of the offending party.

*Id.* at 78 (internal citation omitted). We found that the "key considerations in determining whether such a sanction is appropriate should be: (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Id.* at 79.

Neither of the first two factors identified in *Schmid* favors UFP. There is no evidence that Hechinger intentionally destroyed documents that it knew would be important or useful to UFP in defending against a preference action. In fact, there is no evidence that any of the documents destroyed would have been useful to UFP. There was also no showing that UFP was prejudiced because UFP did not identify any evidence that was destroyed by Hechinger that would have aided UFP. Any finding that this conduct prejudiced UFP would be purely speculative. Therefore, the Bankruptcy Court had little basis for granting UFP's spoliation motion and we will not disturb the Court's denial of that motion.

### D. Denial of Prejudgment Interest

Hechinger appeals the Bankruptcy Court's denial of its request for prejudgment interest pursuant to 11 U.S.C. § 550(a). Section 550(a) provides that:

23

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, *the trustee may recover*, for the benefit of the estate, the property transferred, or, if the court so orders, *the value of such property*, from--

   (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

   (2) any immediate or mediate transferee of such initial transferee.

(emphasis added).  There is no reference to prejudgment interest in the Bankruptcy Code, but courts have relied on the word "value" in § 550(a) as authorizing an interest award.  *In re Art Shirt Ltd., Inc.*, 93 B.R. 333, 341 n.9 (E.D. Pa. 1988).  "[T]he award of prejudgment interest in a preference action is within the discretion of the bankruptcy court."  *In re USN Commc'n, Inc.*, 280 B.R. 573, 602 (Bankr. D. Del. 2002) (collecting courts of appeals cases).  However, "[d]iscretion must be exercised according to law, which means that prejudgment interest should be awarded unless there is a sound reason not to do so."  *In re Milwaukee Cheese Wis., Inc.*, 112 F.3d 845, 849 (7th Cir. 1997).

   As Hechinger notes, the Bankruptcy Court gave no reason for its decision to deny Hechinger's motion for prejudgment interest.  We therefore cannot determine from the record before us whether the Court had a "sound reason" to deny

24

Hechinger's request. We will accordingly vacate the order of the District Court affirming the denial of Hechinger's request for prejudgment interest. We will instruct the District Court to remand to the Bankruptcy Court for an explanation of its reasons for denying Hechinger's request for prejudgment interest.

### III.

For the reasons set forth above, we will VACATE the order of the District Court insofar as it affirms the order of the Bankruptcy Court entering judgment in favor of Hechinger and denying Hechinger's prejudgment interest request. We will REMAND this matter to the District Court with instructions to remand to the Bankruptcy Court for a finding as to whether Hechinger intended the transfers at issue to be contemporaneous exchanges for new value, with the understanding that "credit" transactions are not categorically excluded from §547(c)(1), and for an explanation of the Court's reasons for denying Hechinger's request for prejudgment interest. We will AFFIRM the District Court's order insofar as it affirms the Bankruptcy Court's denial of UFP's spoliation motion.